Thank you. Our next case is Kyocera versus... I see all the nods I think I need to see. On behalf of Qualcomm, yes, sir. Okay. Mr. Phillips? Good morning, Congressman. Please, the Court. Ordinarily, I would start with the claim construction question, but there was a fair amount of focus on the DSU case in the previous argument, and that argument applies with, candidly, even greater force in this particular case, because in order to establish induced infringement in our case, there clearly has to have been a finding of specific intent, and the administrative law judge clearly rejected the idea that specific intent was required. Indeed, the last line on A449 is that intends to induce infringement because Qualcomm provides its customers with the system determination code. That may be sufficient for general intent, but that doesn't remotely satisfy the standards of DSU, and it's not the will of the Court. Well, they're providing instructions, training, updates, marketing, customer support. Why isn't that enough? Well, there are two answers to that. First of all, that's not the finding that was made by the Commission, and, generally, this Court's not in a position to affirm the specific intent determination on a ground different from the one that the Commission itself has adopted. So, at a minimum, you have to vacate and light up DSU and send it back. And then, of course, the Commission would be free to consider that evidence. If you ask me, as a matter of law, whether I think the Commission can get there, I'd say the answer is no, because I think there's plenty of evidence that we acted largely with indifference as to whether this particular mode was used, because we left it to all of our customers to modify the source code to provide any kind of battery saving they chose to provide. To be sure, we touted the fact that there was going to be available the options to try to save power. That was clearly a fact, and we would be foolish not to promote it on that basis. But the bottom line here is that if the case comes to the Commission solely on the basis of induced infringement, and the Commission has made a finding that's based solely on general intent and no effort to comply with this Court's decision in DSU, at a very minimum, the Court has to vacate and send it back. Now, I realize there are significantly broader issues that are implicated in this particular case. And candidly, the Court may not ever need to get to them if it simply follows what, to my mind, is the easiest course, which is simply to recognize specific intent wasn't a finding, and therefore the Court ought to send it back. An alternative ground for vacating and remanding is on the question of claim construction. And here, the claim is pretty straightforward. It is extremely broad. It's a second wireless communication different from the first wireless communication. And our understanding of that claim is pretty straightforward. We say a communication means a communication, and difference, any difference, is sufficient to satisfy that language. Now, Broadcom made an argument that, no, really, if you read it in the context of this particular patent application, what you see is that you're talking about interface protocols, sort of fundamentally different systems of providing it. The Commission rejected that, and Broadcom hasn't re-raised that issue as it comes here. Instead, the Commission adopted what are called methods of communication. Now, the term method of communication is not a language that appears anywhere, certainly not in the claim. It doesn't appear anywhere in the specification. So we are left to try to figure out where do you incorporate or import into the claim this particular limitation. Are you saying that the claim, when it says first wireless communication, second wireless communication, that that just simply means two communications, two messages? Capable of two communications. I think the easier way... What patentable consequence could that possibly be to warrant putting that in a claim? Well, it would seem to me that at least one of the possibilities would be voice communication and data communication are two different communications. And therefore, you could well want to make sure that you cover both of them. But the key to this, I think, Judge Lynn, is not, you know, does every word of the claim have to have some great inventive genius to it, but rather a party who is trying to figure out what does this claim relate to and what is it looking at, reading this would say, well, this doesn't relate to methods of communication. This just relates to different communications. And therefore, if you go to the prior art and you look at Sato and Boris and Moore, each of which specifically references both voice and data communication in dual modes, your natural inclination would be to say, well, they speak directly to this. And that's why... The commission looked very clearly at the specification and found in column four particularly and a little bit in column five, several references that supported their different methods of communication. Can you address some of those? Yeah, I mean, the problem with... Lines 24, 29, 56, 61, so on and so forth. First of all, none of those are limitations. They are all written in broad language. They are all included or may include, et cetera. There's nothing in there that reflects... But they're referencing different methods of communication there. LAN, wireless LAN, et cetera, infrared. But they don't purport to be defining the term a communication, which is the claim language that we're talking about here. When we read the claim in light of the entire disclosure, here they're telling us the different types of communication. Judge Reagan, you have to recognize that when you're reading this in terms of the entire disclosure, that a significant portion of the disclosure in this particular patent was restricted. Remember, there were two inventions embodied in this application, one of which they abandoned. And the one they abandoned was the different methods of communication, the different devices, the different transceivers that could go from one to another. So the fact that you have some of that language in here shouldn't come as a huge surprise, especially when you're talking about the background for the invention because that part of the invention speaks directly to those methods of communication. The problem is when you get to the specific claim here for the battery-saving feature, for this notion of control frequency of scanning for access, when you get to that point, it's just a communication different from... So that's two different emails or two different phone calls? I mean, we can take your difference argument to the other extreme as well. You have to put some context on the word different, don't you? Well, sure. And so they found context. You wouldn't argue that it's just two different emails, right? No. I think the easiest way to think about this is voice versus data as the two differences. And what supports that in the specification? Well, if you look at both on Figure 11 and on Figure 47, when you're talking specifically, there's nothing that remotely restricts the nature of the communications to different methods of communication. And indeed, at least for my money, the hardest part for them to try to explain away is in column 39 on 37 or 8 on down. Because the first part talks about access point provides for communication via one type, okay? This is 32. Column 39, line 32. It says the access point 1409 provides for communication via one type of radio communication while access point provides for another, okay? There you're talking about pipes, methods of communication. Read the next paragraph. In addition, access points might also exist in a single network for providing multiple communication paths in case one access point fails or becomes overloaded, suggesting, at least as I read that, clearly that they don't envision different methods of communication. They simply mean a communication different from another communication. And while that language is, to be sure, capacious, there is no reason in the world to impose any specific limitations that do violence for the specification of set out, at least in my mind, as plainly as it can be. And that's important. There's more context to this, though, in the claim, is there not? Because it says communication circuitry comprising a reduced power mode and being adapted to use these communications to transmit data to access points. So the two different communications that are referenced are different ways used to transmit data. And normally when you're talking about different ways to transmit data, you're talking about different methods, different systems, different structures or something. So to me, if you read this entirely in context, it does look like the reference to first communication and second communication is to different types of methods. I think the answer to that is twofold. First of all, it's not consistent with the way the specification plays out because they're not talking about methods. If you look at column 39 in the language I read, that's clearly not talking about different methods. It's talking about essentially the same method of communication. And second of all, however you want to describe the concept of voice and data mechanisms of communication, it seems to me quite clear that the prior art was very specific in recognizing that that exists and that anyone reading a communication different from a second communication, different from a first communication, would say that at a minimum you're talking about the difference between voice communication and data communication. And that is clearly embodied in the prior art, which to my mind undoubtedly anticipates what we have here in this particular claim. Putting it over and above that, and I just want to take a second on that because the other part of the anticipation argument is the GSM. And there, I don't think there's any question that under anybody's interpretation, if there's different methods, there are clearly different methods of communication that are embodied in the GSM standards because they're talking about two different fundamental frequencies, one that operates primarily in the United States, another one that operates primarily in Europe. So they're talking fundamentally different methods of communication. And the only argument really that was made by the commission in that context is that these worldwide standards that are designed to in fact provide the basis upon which every mobile communication is going to be functioning, was somehow concealed from the public. And one, that's an utterly counterintuitive notion, but second, the evidence is quite clear that this was freely available, it was widely disseminated, and precisely for this purpose. And therefore, if you regard the GSM standards as prior art, which you should, they unquestionably anticipate. But is the GSM standard or standards, is that a single reference is the problem? It seems to me, from my understanding of the way they work, you can correct me if this is not really a fair characterization, but it's more like saying, well, the Wikipedia is a single reference, even though it has thousands of articles written by different people. And if you combined something from one Wikipedia article and something from an entirely different one, you wouldn't be anticipating. But Ms. Patet specifically testified about this and talked about how everything is integrated in and referenced back through in order to make it a single document that would be readily understandable and to provide it. I mean, the difference is, Wikipedia is going to give you the answer to everything in the whole world. What this is designed to do is to give you the answer on how to run a mobile telephone system, and it does so very specifically and deals with this precise problem. But it's not a... I mean, when we talk about the GSM standards, it sounds like we're talking about Chilton's auto repair for a 1989 Volvo. I mean, it's much more complicated than that, I think. It's much more... Oh, it's much more. It's not a... It doesn't at least... But the question is... It's changing from time to time, isn't it? We should give the benefit to the patent holder against the claim of anticipation to say, we're going to completely ignore that, when in reality what the GSM standard is designed to do is to say to the world, this is the way to handle all of the various aspects of this particular cell technology, including specifically the one that's at issue in this particular case, and that it does so well in advance of the patent that's being applied for here. And therefore, if you simply turn to it, you would know that that's already been anticipated. It seems to me the answer... The better way to pursue it is to recognize that this is a source of extraordinary knowledge and use it as a hedge against expansive patent rights rather than to ignore those kinds of claims that are out there. Would a person of skill in the art be expected to understand the entire GSM standard? Well, you could vacate and remand to the commission, I suppose, to specifically decide that particular issue because, again, remember the commission... You kind of have textbooks in every little area of the standard, don't you? Well, actually, I think Ms. Pottet testified, and to be sure, I don't know whether she's the standard. She is probably the world's premier expert. I mean, she wrote an entire book evaluating all important aspects of it, and so therefore I would say that a person under those circumstances clearly could, but I guess the... That's a person of ordinary skill. You've kind of taken her out of the game. And I preface my comment, Judge Rader, with recognizing that she is an extraordinary expert. But I don't know that there was any specific testimony on that because, again, I don't think you should... I don't see any reason why you would adopt an arbitrary restriction on the sources of information that anticipate patents. So, in the first place, I would reject the way the commission analyzed that particular problem. And then if you want to vacate and remand to the commission to take up some of the other issues, that's fine, but I think that the bottom line here is that if this claim is properly... No matter how this claim is construed, if it's properly construed, I remind you, the other three patents clearly... You say that the G.S. Extension anticipated even under the narrow... Right, exactly. And that, to me, is the reason why the court ought to vacate and remand. Let me just take two more points. One is the obviousness... By the way, Madam Pottet said she hadn't read the whole thing herself, right? Right. She wrote... She did write the comprehensive book on it, and I suppose I trust her to describe the important elements, at least, if nothing else. With respect to obviousness, it seems to me clearly that once you have all the anticipations properly analyzed... Is that before us? I'm sorry? Is that before us? I believe it is before you for a number of reasons, not the least of which is that the KSR standard was announced subsequent to the decision by the ALJ. But second of all, obviously, we put obviousness... We plainly put obviousness before the ALJ with respect to the dependent claims, and the dependent claims always incorporate the independent claims. So I think that the Court clearly could take that into account. And again, it seems to me we're talking about potentially crippling the entire wireless mobile industry. And at a minimum, the Court ought to be confident that the nature of the patent claims here are not obvious before it goes down that path. Would he... Go ahead. You had another point, and then I'll get to it. I was going to shift on to Section 337. That's what I was going to ask about. All right. Whether Section 337 gives the right to a cease and desist order with respect to the induced infringement issue. I mean, there's no question that in the right kind of a case, I think there is general cease and desist authority. I think the problem here... With respect to induced infringement? Is that... In other words, if you look at the language of the first section, the subsection of 337, you can come to the conclusion that this is really only talking about direct infringement. But you're conceding that it applies to induced infringement as well? And therefore, in the right induced infringement case, you could have a cease and desist order? I could imagine a cease and desist order. I mean, I do think the cease and desist order here has to go by the wayside because of the nature of the rest of the way the remedial scheme operates, because I think all the rest of it is clearly beyond the power of the Commission to implement... Commission... Now you're talking about the other... I'm really focusing just on the cease and desist order. Right, I understand that. But the cease and desist order is also tied to the way the manufacturers are doing what they're doing, and obviously if that part of the order goes away, I think it's clear that the cease and desist order would have to be vacated as well, apart from... I mean, I think there are obviously liability grounds... I'm not trying to follow where that's true. Because a lot of them have to do with what kinds of benefits you might be providing to the downstream manufacturers, etc., or what kinds of information you may be providing them. And if they have no limitations on what they're allowed to do, at minimum, you would ask the Commission to say, would you impose the same... You might impose the same cease and desist... Yes, would you impose the same cease and desist requirement in light of the fact that you've changed anything else? I see what you're saying. That's all I'm suggesting there. Mr. Phelps, should we hear from some of your co-counsel? One of my colleagues is looking for a 336. Thank you. Thank you, Your Honor. May it please the Court, in light of the colloquy on patent law issues and moving into 337, we stand here on behalf of 19 non-respondents. Most are manufacturers. Some are service providers. A variety of companies and entities, but we have several things in common. One, we were not respondents. We were not named in the complaint. Broadcom had control over its complaint. Secondly, and relatedly, we were not found to violate the statute. That is, we think, fundamental. It is a fundamental flaw. But they're going to say they're just barring the NREM product. They're only acting against the import. Absolutely not, Your Honor, though. If I may say, the order sweeps against us, not just about Qualcomm chips. And I should also say, one thing that I think is undisputed is that the, quote, infringement itself is not the chips or chipsets. It's when, in fact, there is the use of the software, the enabling software. And our final point in which we share a very strong perspective is that this record is barren with respect to substantial evidence of infringement. They chose their case. They put on their case. It was an extraordinarily weak case. It doesn't come close to substantial evidence. I hope to spend my time, depending upon the Court's questions, on the statute. Then my colleague, Ms. Frost, is going to speak with respect to the arbitrary and capricious nature of the order and the lack of substantial evidence as to certain entities. And then my colleague, Mr. Kasanias, will talk about procedural issues, which I will talk to and speak to, depending on the Court's questions, in terms of procedural flaws. He will speak to the due process implications that would flow if the Court does not accept our interpretation of the statute. So let me turn to the statute itself, D-1 and D-2. We think D-1 is pellucidly clear. It requires, for a limited exclusion order, for there, in fact, to be a determination with respect not simply to articles, but a person violating the provision. We were not found to violate The Commission said this in several places. I would like to quote from page A83, a very short quote, but it makes what we think is the fundamental case-ending point as to us. We should be out and relieved of this litigation nightmare. Here is what the Commission said. We began with a threshold question of whether the Commission has authority to issue downstream relief where, as here, the downstream products are manufactured by parties not having been found in violation of Section 337. That is page A83. There are other such pages. Your Honor, some few months before the Commission made this statement, looking at the statute that you're talking to us about, it doesn't talk about persons. It talks about entries and imports, things, not persons. Your Honor, if I may, if one reads the entirety of D-1, D-1 goes on to say, imported by any person violating the provision of this section. And that combines with D-2. If there is any lack of clarity prior to 1994 in terms of the reach of the Commission's power, Congress has now spoken in Chevron Step 1 language precisely and specifically to the question at hand. Because of the very kind of authority exercised here, sweeping in an entire industry, the gap panel determined in the late 1980s that this was in violation of our solemn obligations under the General Agreement. Congress specifically focused on that, and you have in the briefs very clear articulations in both the Senate report and in the House report explaining the language of D-2. That is, if there is any doubt under D-1, and there shouldn't be, in light of a person violating the section, then D-2 fills in any gap. It is not in D-1, but if one says, well, what's Congress driving at? And Congress, of course, and the statute, of course, governs both, and this is elementary Chevron, the Commission. And the Commission has, frankly, not dealt with this in a very, what shall I say, articulable manner. When one reads its analysis of its authority, it sweeps past the very fact that because of the gap violations, Congress said a limited exclusion order, and that's what was entered here, that's what was solved by Broadcom, the master of its complaint. Congress said, that shall be limited to persons determined by the Commission to be violating this section. So why isn't it fair to read that section to mean, because I agree with Judge Traylor, the focus is on the articles throughout. These are NREM-type remedies we're talking about. Why is it not fair to read that to talk about exclusion from entry of articles limited to the articles of persons determined by the Commission, which is what we have here, articles that are manufactured by Qualcomm. Your Honor, first, I would guide the Court to focus on the GATT analysis and why that kind of analysis, which is in fact the pre-GATT amendments, the Uruguay Round amendments in 1994. That is exactly what the Commission's policy was. But Congress said, no, you can't do that because that is raising questions. Why is that? Because of national origin treatment, a district court could not do that. And that's what GATT said and Congress agreed. A district court in an injunction could not do that domestically, and so the national treatment provisions requires this. But let me move to a procedural point because I think our procedural point also answers the question. We have been determined, even though there was no violation, again, proven, there's a total lack of substantial evidence, we were denied rights under 337C. 337C says, notice, opportunity to be heard, the opportunity, quoting from the language of the statute, each determination should be made on the record after notice and opportunity for a hearing. We were excluded from this. We weren't named to begin with. And then the efforts at intervention at the liability phase, there was one effort, Verizon, told no. That's what litigate... Well, I take it... Let me go back to the question which I had exactly the same question as Lynn. The construction of D2, I suppose you could read the persons determined by the commission, I mean, articles of persons, even though you have to read those words. But doesn't that still have a problem when you read the rest of the clause which says determined by the commission, persons determined by the commission to be violated. Your point is, you aren't a person who's been determined to violate, so even if articles of are read in, that still doesn't get them where they need to go. They are nowhere near because articles are chip sets. We, of course, are manufacturers of handsets. And again, the only evidence, the substantial evidence is utterly lacking here because of the one handset, a single Samsung handset for the European market with a completely different regime. That simply doesn't work. But if I could make, I see my time has expired. May I ask you a question about D2? Picking up on Judge Rison's question, what D2 goes on, without using the term general exclusion order, is to then set forth, if you want Broadcom to go after this entire community of folks around the world, an entire industry, then prove to the commission that you need a general exclusion order. We think the language of the statute and the structure is absolutely clear and it all begins with the complaint. Why didn't they name us if those are the articles of abuse? This is basic fairness. We should have had the opportunity to be heard. They control the complaint. The comments of the court with respect to confidentiality suggest we don't know what the allegations are and different appellants here had different bodies of information at different times. The point is there is a veil of ignorance. There was no opportunity for us to be put on notice with respect to this, but this provision of C we think is absolutely clear and goes back to the very beginning, namely a complaint. Now, you raised the general exclusion order issue and I think you're quite right. The 2 appears to be the way you can get to a general exclusion order through the exceptions to the general, more restrictive language of D2. But if I understand correctly, prior to 1994, all there was was one. It wasn't denominated one. And yet the commission was issuing general exclusion orders at that time on occasion, I take it. So my question is if the commission could take one, including its language about imported by any person violating the provision of this section and justify a general exclusion order prior to 1994, doesn't that suggest a broad reading for that language of at least D1? Set it aside now. I don't think that that follows you, Walter. I don't think that the D2 power with respect to general exclusion, which Congress has essentially, we're going to permit that to go, even though it's controversial in the international trade community. And I think that what Congress was trying to say here is very simple. If you want to exclude articles of Motorola, Samsung, you name them in the complaint. You know who they are. You name them in the complaint. You don't seek, which is exactly what happens here, the functional equivalent of a general exclusion order, but to simply proceed under a limited exclusion order with the various rights that we have, but we're denied. Why is a general limited exclusion not a horizontal distinction, meaning we're talking about parties similarly situated to Qualcomm, not the downstream users? I think the general exclusion order, in fact, has been interpreted as being too downstream in order to vindicate the policies of the statute. So we do not quarrel with the possibility that there is power on the part of the commission to issue a general exclusion order with respect to downstream if the provisions of D2A and B are met. There's no suggestion that those provisions have been satisfied here. I thank the Court. Thank you. Ms. Cross? Good morning, Your Honor. May it please the Court. I will address why the remedy order must be vacated as arbitrary and capricious and not supported by substantial evidence, irrespective of how the Court decides the other issues presented here today. There are three fatal flaws in the order that require vacation of that order, which I'll briefly discuss. The first is the commission's decision to, out of the blue and without warning, exclude QWERTY devices, such as RIM BlackBerrys and Palm Trios and Sentro smartphones from importation. The second is the commission's decision to exclude WCDMA devices without a clear or sufficient evidentiary basis for doing so. The third is the commission's decision to impose a downstream remedy at all without a sufficient evidentiary record. Aren't these all Qualcomm chips? Yes, Your Honor. There are Qualcomm chips in the products, but that's not what's being excluded, just the chips, the actual handsets. With respect to QWERTY, to start with, the exclusion of QWERTY devices was contrary to the patent owner Broadcom's specific request. During the proceedings before the ALJ, Broadcom affirmatively declared on the record that it was not seeking relief against PDAs, smartphones, or data cards. The ALJ acknowledged and accepted this. The staff agreed with Broadcom and advised the commission that QWERTY devices should be exempted from the exclusion order. Nonetheless, in contravention of the patent owner's election not to pursue a remedy against QWERTY devices, and against the commission's longstanding policy to grant relief no broader than requested by the complainant, the commission arbitrarily and without warning excluded QWERTY devices from importation in its limited exclusion order. The commission abused its discretion again in excluding WCDMA-capable devices. Qualcomm chips for operation and handsets for use on WCDMA networks like AT&T Mobility's HSV-TA WCDMA network or T-Mobile's then-proposed one were not the focus of the investigation. They were not specifically accused of infringement in the complaint. No parties sought discovery from either AT&T Mobility or T-Mobile. Discovery was specifically limited to CDMA, GSM, and EVDO platforms, which were the main focus of the case. The evidence in the record regarding WCDMA was scant at best and insufficient as the dissent clearly pointed out. Nonetheless, the commission majority entered an exclusion order barring WCDMA-capable handsets. Finally, the commission abused its discretion by excluding downstream products at all. The commission considered a total exclusion of all products containing Qualcomm chips and rejected it as too harmful to third parties, especially wireless networks, and as contrary to the public interest. Broadcom suggested RemedyFair know better and was likewise rejected as harmful to third parties and contrary to the public interest. The commission went to great lengths here to try to get a record together. Any final comments, Ms. Frost? Yes, Your Honor. The commission's order represents an abusive discretion and must be vacated because there was no evidence upon which it could vacate a limited exclusion order vetted in it. Thank you very much. Mr. Kostanais? Kostanais, Your Honor. Thank you very much. That's all right. I've heard it before. And may it please the Court. In the brief time I've got this morning, I want to talk a little bit about the due process problems that would be created if you don't adopt the interpretation of the statute. The ITC made a special point out of convening a hearing on remedies and opening it up and giving everyone notice. Doesn't that meet due process? Not that it's way too late, Your Honor, because at that point, liability has already been established. And what we're talking about here principally is our ability to defend against the finding of liability. Now, to frame the due process argument, Your Honor, it's worth stepping back for a second from doctrine and taking a look at this question. How did it come to pass here? How did it come to pass that the ITC issued an order excluding at least 16 different manufacturers of wireless devices without either those companies or their devices actually being before the ITC? How did it happen that they weren't allowed to present defenses of non-infringement? How did it happen that they weren't allowed to present defenses of invalidity to amass their own set of prior art against these patents? How did this happen? The due process clause would never have allowed that to happen in the district court. Blonder tongue would have forbidden the sort of preclusive effect. Didn't many of you get actual notice via subpoenas during the liability phase which would have enabled you on the basis of that actual notice to seek to have your rights vindicated? Judge Rader, that notice might have notified somebody that there was a proceeding pending, but it wasn't noticed that these companies' products or their, really, their livelihoods in those markets were being judged. Are you trying to convince us you really didn't follow this at all? Well, first of all, Your Honor, with respect to the members of this industry, there is no record, so I can't tell you what the record would reflect. That's one of the problems here. Another one of the problems about not following it is that we're talking about members of an industry that aren't located in the United States in many cases. And they certainly, under 44 U.S.C. 1508, are not presumed even if Federal Register Notice was enough, which is not under Malay, which I'll get to in a minute. But under 1508, Federal Register Notice only is presumed to be sufficient for the United States of America. Remind me. I know it was referenced in the brief, so I just can't remember. Were there efforts to intervene at the liability stage? A variety of them made an effort to intervene at the liability stage and was rejected. At that point, the die was cast. It would have been futile for anybody else to try. Now, let me ask you this question. Assume that this case had been begun as a general exclusion order case. Was that in mind as the remedy sought? How would your situation be different with respect to the due process issues? So, if I understand the hypothetical, the case starts as a general exclusion order case, but results in a limited exclusion order. Well, let's assume that it results in a general exclusion order, but you are equally out of the liability phase and the remedy phase is certainly the liability phase, right? That's right. And why wouldn't your due process argument have the same punch as it does with respect to the LEO? Well, I think if you look at D2, Your Honor, a general exclusion order is only available in a limited set of circumstances. But those circumstances have nothing to do with your particular... But they might. They might. I would say, first of all, of course, that a general exclusion order would not be appropriate here because we were... You can go to the Qualcomm website and find the list of all of its licensees. It would not have been much more than basic due diligence to find that out. We know from Malay that notice reasonably calculated to apprise potential respondents is what's necessary. The Federal Register notice isn't enough there. And with regard to the general exclusion order requirements in Section D2 of Subsection D2 of Section 337, those requirements roughly parallel the situations where under Malay publication notice is enough. It's where it's difficult to identify all of the possible respondents or where it's otherwise necessary. If the best you can do is publication notice, then Malay says that's okay with regard to due process. Let me just... On that due process note, let me just address a couple of other things. There's an undercurrent in the ITC and Broadcom briefs that we don't have any due process rights because we're talking about imports. And for that proposition, they cite the 1904 case in Buckfield. This is a procedural due process case, not a substantive due process case. And it's very clear that even when administrative law is at issue and you're talking about adjudications, there are... They do make reference to that, Doctor, but they put more weight, I think it's fair to say, on the in rem aspect. The in rem nature. They do. And it's important there, I think, to note that in both Malay and in the Supreme Court's later decision in the Mennonite missions case in 1983, the Court said very clearly that the same due process protections apply whether it's in rem, quasi in rem, in persona. In fact, if anything, if you look at the in rem cases that the Supreme Court has had, whether they be in civil forfeitures or otherwise, there is a heightened risk of a deprivation of due process in those circumstances. Some final thoughts, Mr. Castani? Yes. Judge Rader, the... Ultimately, the comment that's made in the... In particular, in the Broadcom breach, they make very... very colorful use of the Bleak House analogy, and they say, oh, my gosh, if we had been... had to name all of these people as respondents, well, there are 16 of us as manufacturers here. And right now, the same NOJ who had this case is handling a case where I wrote and I represent the complainant with 49 different respondents, all named as respondents in that case. It was a two-day Markman hearing on four patents, very common for district court action. And ultimately, what I want to leave the court with is this. If this case had happened in this way in a federal district court, neither Blondertongue nor Supreme Court jurisprudence on virtual representation would have allowed this inducing where Qualcomm was left to defend against the charge that they were directing, for instance, by Antithet manufacturers that never would have been allowed to be preclusive in later litigation or in the same case against manufacturers like ours. And if the district court would not have allowed that, it would have a national treatment problem for the same reason that the GATT panel had. Thank you. Thank you, Mr. Castanez. Before we move on to the next item, I calculate somewhere in the neighborhood of eight minutes of overrun, so each of Ms. Cason and Mr. Van Nist will have four additional minutes should they need to use them. That will keep time roughly even. May it please the court. By any standard, the action taken by the commission in this case was reasonable and measured. Is it particularly so when viewed in the context of the statutory purpose to provide remedial relief against the importation of articles that infringe valid U.S. intellectual property rights? You're going to have to help us read the statute. It talks about limited persons determined by the commission to be violating. Yes, this again comes into Section 337D2 which was added to the statute in 1994 specifically and precisely to address the concerns addressed by the Gap Panel Report in which the issues were whether entities, firms that were not named in an order that produced parallel products to those that were produced and found infringing could be excluded. And the statute clearly states that Section D2 was added only for that purpose. It was not added for any reason to address downstream products. In fact, nowhere in the legislative history or in the statute is the term downstream products precisely mentioned. This Court has previously held in the Hando case using the language that was in Section 337D and is now Section 337D1 that the Commission does have authority where appropriate to issue orders extended to downstream products provided it applies a proper test. And the Commission in this instance and in that instance in APROMS provide a nine-factor test where it looked at the factors specific to whether the downstream product was necessary, as in this case where virtually all of the infringement products come in as integral parts of a downstream product. Is it then necessary to exclude those downstream products? But Hyundai and the APROMS tests don't really inform the statute as amended in 1994, and we're left with the language that Judge Starr  in his entry, articles limited to persons determined to be violating the section. Now, I asked Mr. Starr whether that section shouldn't properly be read as if it meant articles limited to the articles of persons determined. And it seems to me that that's not entirely the right way to look at this statute and that you have a problem in defending the application of this statute to downstream products in the circumstances of this case. Why am I wrong? First of all, if you look at the title of Section 307D, the exclusion of articles from entry, that's what this whole section is talking about. And it says that the commission does conduct an in person proceeding in the initial stages of the investigation under 337A. It looks specifically to see if there are violations based upon infringement that is found. Having done that, the commission then turns to 337D where Congress has mandated that an exclusion against the articles found to be infringing. At that point, once you get to remedy, you are now in an interim proceeding. And the commission has to have first found a violation that some person has violated in the statute. It then looks at how to best exclude the articles that are infringing the articles that are causing that violation. The violation here is only by Qualcomm, correct? Correct. All right. So Qualcomm is the person determined by the commission to be violating this section, right? Correct. So the entry of articles shall be limited to persons determined by the commission to be violating this section. This case, again, is about the source. What is the identity of the product? Are you saying that's what's going on here? Yes. All that's being excluded is Qualcomm's articles? Yes. There are two different concepts that the appellants seem to conflate. One is the decision between the appellant and  commission.   the decision between the commission and the appellant. And this is a different concept as to the vertical concept, as to what to do with those identified infringing products, when those are incorporated into downstream products. They enter the country almost  all the time. What do you say to the language from D1? Imported by any person violating the provision. These were imported by Qualcomm? The commission said violating D1 is a violation  the statute. Any person is now violating the provision once the commission has determined the violation. The determination has to be specific to a person. Once there has been a violation, any person can violate the provision. Even if they haven't been adjudicated to be a violator? That's correct. So a person violating could be anyone whether they had notice or not. Anybody importing the infringing articles. If you read it any other way, you can have new imports coming along. You don't need to violate the provision. If the articles which have been adjudicated to be infringing are imported by any person, you can leave out violating the provision. That would emphasize that the patentee could import the product. If somebody licensed could import the product, that would not be a violation. There are circumstances under which those products can come in. For instance, if they're licensed. You relied on the Hyundai case, but in that case, there was one person, Hyundai, one named party, who was doing all of the importing. The downstream products were the products of Hyundai. This is very different, isn't it? Why not require naming the different downstream parties? Why not simply require them to be named up front and rely on this language from the statute is the reason for that? The statute nowhere requires that. In this case, the inducement was by Qualcomm. I note, just by parallel, in any inducement case you can name the inducer. It is strange that it is different because it is not different in those circumstances. In  normal circumstances, the remedy is directed at the inducer. There is no need to name the inducee. The same would be true for manufacturing chips. A foreign manufacturer would be allowed to bring them in freely. That would be inequitable. It would be contrary to the purpose of the statute. The remedy only went to the chips. Why not? The U.S. manufacturer could assume that there was an adjudication in a case involving another defendant of patent infringement. That would not bind the second potential defendant. In a district court proceeding, once there is an adjudication of infringement with respect to defendant X, there is a new adjudication. If defendant X can't sell the product and give the support that causes the infringement, then the inducer can't infringe. In the case, one of the test was provided as a proper balancing test. What are the factors unique to determining whether a downstream product should be excluded from entry? I also note that several provisions talk about exclusion by the source and not by the downstream producer. Turning to some of the process claims that have been raised, we would suggest that the cases really are not probative here. The appellant decided dozens of cases in the Supreme Court dealing with the issue of seizure of property in the United States, a father's paternity rights, but those are entirely different issues from the right to import. Clearly, the Supreme Court held in 1904 that the right to import is not subject to the constitutional due process rights. This court discussed the 200 years worth of case   investigation and the commission did just that here. By the title, the investigation covered the Qualcomm chips as well as products containing those chips, including handsets. Further, as the court noted, we stated in our brief at page 78 and at the commission's opinion at page A94, several appellants had actual notice through subpoenas or other confidential types of consultations with the counsel throughout the investigation. The actual notice in this context, if you don't have a right to intervene,  no right to intervene. That was why I asked the question about that. I gather the one would-be intervener got told to pack his bags and stay away. They waited until about a week before the trial. This is almost nine months or ten months into the case. The evidence was  They had actual notice well prior to that time. I believe that would have been something for the judge to decide whether the criteria were met for intervention. The commission has a presumption that it will allow parties to intervene when they move in a timely manner. That was the criteria for intervention. In fact, some of the appellants did participate. They did not have any say in what the commission issues. They did participate fully. The commission took their position. Some of the appellants complained that they were not surprised at the scope of the  ultimately issued. Again, the title of the investigation made it clear that it applied to all handsets. The remedy notices specifically asked for comments on the appropriate remedy. The public ID issued by the ALJ specifically referenced a phone that was said to be on sale in the United States for use in the mobile network. Clearly, those parties had noticed that their phones could be affected by the order. The fact that no other parties could have a chance to respond does not mean that they were entitled to anything else, any other fair notice of what the commission was going to do. I'm just briefly addressing some of the issues that Mr. Carter raised. First of all, we note that this is a classic case of inducement. No matter what standard you look at here, clearly the judge found the findings here clearly support a case where the parties were in a design partnership. Qualcomm provided instructions, advertising support, continued support, continued encouragement to use these chips for the software combination. It's very difficult to think of a case where you could have more facts pointing towards inducement by a producer as an act in the concert to aid the manufacturers in the use of infringing software. Is it intent to use    act to         know. I don't know. I don't know. I don't know. I don't know. I don't know. There      successful design. That is not a finding. We don't think it's valid. You would never have a  because the defense would always be available. I think the fact that it is not valid is not a defense against infringement. The fact that they knew about the patent and knew that they were embedding the software meets the standards. It would make a difference if they possessed an opinion of counsel with respect to validity. That's not the case here, but I don't think it would because it still would raise the same concerns. It still would raise the same issues that anybody can go get an opinion of counsel. They still know about the patent and are inducing infringement. They can go for an opinion  counsel with respect to validity. If they knew that there was no direct infringement, then you couldn't have infringement because that's the first element of infringement. Your basic argument is that well, it's almost impossible to prove an intent to induce infringement because people could always raise the validity of defense, but didn't we aren't we in almost the same posture with willfulness and in Seagate we still raised the bar for willful infringement? Giving someone who has genuine validity concerns a rather easy way to avoid willfulness? I'm wondering if this is analogous, if the DSU change on intent caused an analogous raising of the bar? I would say that it didn't because it's a different standard that you're looking at. You can have  infringement by its nature is that it goes a step higher than just normal infringement or just wanting to induce someone to infringe on them. There's a good reason we make it hard to prove inducement. It is indirect after all. So we do make it tough. And this intent is the critical aspect of that. Are we honoring enough the difficulty of proving indirect infringement in this case? Again, in this case, there is no finding of invalidity anywhere. Yet, in this case, it is so clear that Qualcomm is providing support, instruction, and it's in that design partnership. They're interlocked with the manufacturers in designing and using and continuing to use these chips in an infringing fashion, that it would be difficult to think of another case where you could have a more strong example of inducement. This is a case that certainly the partnership relates to the activity. There's no question about that. But that still leads unanswered this question about the requirement to show specific intent to infringe. They specifically encouraged the manufacturers to use this even after the file. There's no question about that. That's fine. But where does that show the specific intent to infringe? Maybe your argument is well, they are aware of the patent. That in and of itself is enough. I would say if that's what is held in the form, that's what the actual knowledge of the patent is sufficient. If you know about the actions that constitute infringement, that's what that is. I don't think the case has been said. I think a whole lot of cases did not say that. In this case, again, we would note that even after the complaint was filed here, CLAWCOMM continued to induce infringement by the manufacturers. In fact, much of the evidence that's deduced in the hearing here talks about continued partnership between CLAWCOMM   having been on notice about CLAWCOMM saying that these products are infringing the patent. It's not a patent that's sitting under the table. I do want to begin where you are right now with the patent issues and then I do want to address the statute and the remedy as well. Let's start right where the court is. On inducement, the findings here on this patent were far more extensive than what we talked about earlier. First of all, there was a finding of direct infringement by CLAWCOMM themselves. Judge Bullock found that the chips programmed to perform these functions directly infringed five separate claims of the 983. There was a finding of direct infringement. On page 449, Judge Bullock found that not only is there a design partnership, not only is CLAWCOMM recommending that handset makers implement these features, not only are they knowingly inducing them to reduce the frequency of scanning for access points, which is precisely what the patent calls for, but he found they had knowledge of the infringing acts. What he found here was they encouraged them, taught them, directed them, they had knowledge of infringing acts, not just of conduct, but infringing acts, and he found that they intended to induce infringement. He was cognizant of this sort of general and specific idea because he points out that this  was a substantial evidence test. The question is was he using the right filter? I think he was. He said here that they had knowledge of the infringement and intended to induce it. In the old days before DSU, all you had to show was knowledge of an act. Here he's saying they have knowledge of infringement and they are encouraging it through their work with their customers. They don't have an alternative non-infringement position. Their only argument is the one Mr. Phillips advanced on the claim construction argument. They conceded that if they couldn't change the claim construction, they had a clear situation of infringement which is why chips were found to infringe and they were found to infringe in the cell phones and on the networks. The interplay between the claim construction argument and the intent, if they really believed reading the Sorensen case that difference meant any kind of difference such as Mr. Phillips was suggesting to us, the simple difference between radio and voice communications, if they really believed that, did they have intent to infringe? I don't think, point one, your honor, I don't think anyone has ever addressed the notion of if your only basis is claim construction, that's enough. There's clearly no law on it. But I would say here that claim construction that they're advancing now is far-fetched and I want to commend them for making those claims and recommending them to implement the battery saving features. On the claim construction, judge Bullock went carefully through the specification just as the court did in the Sorensen case and he found in many places two different methods of communication. Judge Rader referred to column four and clearly there we're referring to different methods like wired LAN, LAN, wide area  Column five is made even more clear. There the invention itself is described as something having two transceivers with, quote, two different operating characteristics for conducting data communications on different subnetworks. This is the description of the invention itself. And it goes on to say that these different subnetworks could include wired, wireless, radio frequency, wired network communications and infrared. Mr. Phillips sent us to a place on column 39 starting with line 31. How would you deal with that particular passage? That plays right into what Judge Bullock found. As he pointed out, the paragraph preceding that makes crystal clear that this device works when you have one type of radio communication and then another type of radio communication and it gives some examples. It then goes on and says in addition, you can also do other things. That doesn't mean that you're not working in a dual mode. It says you can also do some other things within the context of this. I think possibly the clearest example of what Judge Bullock found, and he cited this in the ID, is column 42. Line 22 says, point blank, the present invention contemplates various combinations of communication technologies all accommodated by communication modules. There is simply no question that what Judge Bullock did was exactly what this panel has admonished district judges and ITC to do, and that is read the claim in light of the specification. It is abundantly clear throughout that this invention is working on two different communications methodologies. The text that Mr. Phillips referenced that you just referred to in column 39, the in addition language, is a reference to figure 47. And the in addition  to figure 47 talks about access points 1409 and 1413 might also exist on a single network. So it is not just a reference to figure 47, but in addition to a system such as outlined in figure 47, this is in addition meaning in the alternative. I'm not sure it is clear, Your Honor. I do know that figure 47, of course, makes abundantly clear that you are talking about two different communication methods. It is one of the things that Judge Bullock relied on in reaching that conclusion. Absolutely. But then the question remains, what does this additional language mean at line 37 through 40? But it has little to do with claim 1. What he was construing was different methods of communication in claim 1 and the other independent claims. And those claims are all directed towards these different methods of communication as fully really elucidated by this.